1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         NORTHERN DISTRICT OF CALIFORNIA
10              San Francisco Division
11

12  ELIZABETH LESLEY MESA,                    No. 14-CV-1821 LB

              Plaintiff,                       **ORDER GRANTING IN PART AND**
13                                             **DENYING IN PART PLAINTIFF'S**
                                               **MOTION FOR SUMMARY**
14       v.                                    **JUDGMENT AND DENYING**
                                               **DEFENDANT'S CROSS-MOTION FOR**
15  CAROLYN W. COLVIN,                         **SUMMARY JUDGMENT**
    ACTING COMMISSIONER OF SOCIAL
16  SECURITY                                   [Re ECF Nos. 21, 22]

17            Defendant.
18

19                          **INTRODUCTION**

20       Plaintiff Elizabeth Lesley Mesa moves for summary judgment, seeking judicial review of a

21  final decision by defendant Carolyn W. Colvin, the Commissioner of Social Security

22  Administration (the "Commissioner"), denying her Social Security Income ("SSI") disability

23  benefits for her claimed disability allegedly resulting from back pain, neck pain, depression, and

24  carpal tunnel syndrome.  (Administrative Record ("AR") 73.)  The Administrative Law Judge

25  ("ALJ") determined that Ms. Mesa could not perform her past relevant work but that she was

26  capable of performing other jobs that existed in significant numbers in the national economy and

27  was thus not disabled.  (AR 32-33.)

28  

United States District Court
Northern District of California

1    Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

2    without oral argument.  All parties have consented to the court's jurisdiction and now move for

3    summary judgment.  (ECF Nos. 9, 11, 21, 22[1].)  For the reasons stated below, Ms. Mesa's motion

4    is **GRANTED IN PART** and **DENIED IN PART**, the Commissioner's motion is **DENIED**, and

5    the case is **REMANDED** for reconsideration.

                                                **STATEMENT**

6

7    **I.  PROCEDURAL HISTORY**

8    Ms. Mesa, now 46 years old, filed a Title II application for a period of disability and disability

9    insurance benefits on January 28, 2009.  (AR 62.)  She then filed a Title XVI application for

10   supplemental security income on July 14, 2009.  (AR 62.)  Both applications alleged disability

11   beginning on November 1, 2007, but were denied both initially and on reconsideration.  (AR 62.)

12   On November 14, 2010, Ms. Mesa protectively filed both a Title II application for a period of

13   disability and disability insurance benefits and a Title XVI application for supplemental security

14   income.  (AR 20.)  In both applications, Ms. Mesa again alleged disability beginning on

15   November 1, 2007, but these claims were again denied both initially and on reconsideration.  (AR

16   20.)  Ms. Mesa thereafter requested review by an Administrative Law Judge.  (AR 106.)  An ALJ

17   held a hearing on May 30, 2012.  AR 41.  Ms. Mesa appeared with her non-attorney

18   representative, Dr. Dan McAskell, and testified at the hearing.  (AR 43.)  A Vocational Expert

19   ("VE"), Ms. Sandra Trost, also testified.  (AR 20, 51.)

20   The ALJ published a decision on June 8, 2012 and found that Ms. Mesa was not disabled.

21   (AR 20-21.)  The ALJ explained that he had determined that Ms. Mesa was capable of performing

22   various jobs which exist in significant numbers in the national economy.  (AR 32.)

23   On June 22, 2012, Ms. Mesa requested that the Social Security Administration ("SSA")

24   Appeals Council review the ALJ's decision.  (AR 15-16.)  This request was denied, and this denial

25   rendered the ALJ's decision the Commissioner's final decision.  AR 1.

26   _____

27   [1] Citations are to the Electronic Case File ("ECF") with pin cites to electronically-generated page numbers at the top of the document.

28

United States District Court
Northern District of California

Ms. Mesa filed a complaint for judicial review under 42 U.S.C. § 405(g) on April 21, 2014. (ECF No. 1.) Ms. Mesa and the Commissioner both now move for summary judgment. (ECF Nos. 21 and 22.)

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) the vocational expert's testimony, (C) the testimonial evidence provided by Ms. Mesa, and (D) the ALJ's findings.

### A. The Medical Evidence

#### 1. *Sutter Medical Center of Santa Rosa* from 12/6/05 - 6/22/09

On December 6, 2005, Ms. Mesa visited the Emergency Department at the Sutter Medical Center of Santa Rosa ("SMCSR"), seeking a "return to work excuse." (AR 276.) She was seen by Dr. Robert Landman, to whom she reported intermittent back pain. (AR 276-77.) She explained that she had experienced such pain in the past, but that it had gone away on its own. (AR 276.) Dr. Landman found that she had a full range of motion with regard to her back, but that she did have "minimal right paralumbar muscle tenderness." He concluded that she had a "resolved acute low back strain," but that she was able to return to work. (AR 277.) He wrote her a prescription for ibuprofen and told her to check in again if the pain increased. (AR 277.)

On September 27, 2006, Ms. Mesa returned to the SMCSR Emergency Department, reporting that she had injured her back while attempting to move a 50-pound air conditioner. (AR 274.) She was seen by Dr. TW Hard, who noted Ms. Mesa's description of "pain in her lower back area radiating down into the posterior legs, predominantly on the right side." (AR 274-75.) Dr. Hard found that Ms. Mesa's neck was supple with a full range of motion, but that she had a "low back strain." (AR 274-75.) Ms. Mesa was given Toradol which provided relief and Dr. Hard prescribed Vicodin, Soma, and Motrin. (AR 274.) Dr. Hard ordered x-rays of Ms. Mesa's lumbosacral spine, which indicated that Ms. Mesa had a "narrowing of the L5-S1 intervertebral disk space with anterior osteophytes" and "[s]maller anterior osteophytes . . . at the L3-4 level." (AR 275, 347.) Dr. Hard concluded from these x-rays that Ms. Mesa had "moderate degenerative

United States District Court
Northern District of California

joint disease, but no significant slippage, dislocation, or fracture."  (AR 275.)  Dr. Hard recommended that Ms. Mesa engage in only light activity for three days and she was given a 72-hour work excuse.  (AR 274.)

On December 2, 2006, Ms. Mesa returned to the Emergency Department at SMCSR and was seen by Dr. Richard Reisman, who noted that she was "somewhat distraught."  (AR 270.)  Ms. Mesa reported experiencing "[s]ome lumbar back issues" and "slight neck problems" in the past.  (AR 270.)  Ms. Mesa explained that she had been in a car accident five days earlier, after which her neck began to feel sore and she noticed tingling in her right fourth finger.  (AR 270.)  Dr. Reisman's examination revealed "some tenderness of the posterior musculature" in her neck, but "no obvious spine tenderness."  (AR 270.)  He ordered x-rays and an MRI which showed "minimal degenerative disk changes" but no fracture.  (AR 270, 273.)  Dr. Reisman concluded that Ms. Mesa had a cervical strain and a possible peripheral nerve injury.  (AR 270.)  Ms. Mesa was given morphine while in the Emergency Department, which provided pain relief, and was prescribed Vicodin.  (AR 271.)  She was released and asked to return if her pain did not improve within the next several days.  (AR 271.)

Ms. Mesa did not return to the Emergency Department at SMCSR until June 22, 2009.  (AR 267.)  She had been having pain in her first, second, and third fingers for about three weeks.  (AR 267.)  She was seen by Dr. Eric Sterling, who described her as a "well-developed, well nourished female," but noted that she was in "mild distress."  (AR 267.)  Dr. Sterling ordered x-rays of her cervical spine, which he described as "unremarkable."  (AR 267.)  He found the symptoms "consistent with a very mild radial nerve palsy and inflammation" and noted that she was also experiencing neck pain.  (AR 267-68.)  He started her on an anti-inflammatory medication and pain relievers, but found her in stable condition and discharged her.  (AR 267.)

### 2. Santa Rosa Community Health Centers from 12/19/06 - 10/12/11

From 2006 to 2011, Ms. Mesa regularly visited the Southwest Community Health Center, one of seven facilities that constitute the Santa Rosa Community Health Centers ("SRCHC").  She was seen primarily by Dr. Joel Lewis and Physician Assistant Lupe Pacheco for medical treatment and

United States District Court
Northern District of California

by Dr. Valerie Smith for psychotherapy treatment, each of whom filled out Progress Notes for each visit.  (*See* AR 279-85.)

### a. Dr. Joel Lewis and PA Lupe Pacheco

On December 19, 2006, Dr. Lewis noted back pain and depression and prescribed Ibuprofen and Zoloft.  (AR 284.)  On January 31, 2007, he noted both back and neck pain.  (AR 285.)  On February 13, 2007, Dr. Lewis noted a knot Ms. Mesa's back, as well as chronic neck and upper back pain.  (AR 285.)  On May 2, 2007, someone other than Dr. Lewis (whose name is illegible as written on the Progress Note) noted lower back pain as well as "muscle tension, post neck and upper left back discomfort."  (AR 283.)  This Progress Note also mentions Zoloft, PT (presumably physical therapy) and chiropractic work.  (AR 283.)  Ms. Mesa returned to SRCHC on May 21, 2007 and someone other than Dr. Lewis (whose name is also illegible as written on the Progress Note) noted Ms. Mesa's back pain.  (AR 282.)  On July 26, 2007, Dr. Lewis noted a bump on Ms. Mesa's shoulder blade.  (AR 281.)  On January 14, 2008, Dr. Lewis noted depression and chronic neck/back pain.  (AR 280.)  On September 5, 2008, Dr. Lewis again noted Ms. Mesa's neck pain. AR 279.  On January 22, 2009, Dr. Lewis again noted depression and chronic neck/back pain. (AR 279.)

Ms. Mesa was seen by Dr. Lewis again on June 17, 2011 and Dr. Lewis noted degenerative disc disease, drug abuse, depression, neck pain, and amenorrhea.  (AR 330.)  He prescribed her Doxepin for her depression.  (AR 330.)  On July 17, 2009, Dr. Lewis listed carpal tunnel syndrome in the Progress Notes and gave her a splint to wear for it.  (AR 326-27.)  On August 17, 2009, Dr. Lewis listed degenerative disc disease, drug abuse and alcohol dependency (both in remission), and neck pain.  (AR 324.)  He prescribed her Tramadol for her degenerative disc disease and referred her to physical therapy for her chronic neck pain.  (AR 324.)

On September 1, 2009, Ms. Mesa was seen by PA Lupe Pacheco, who found her to be suffering from joint stiffness, joint pain, carpal tunnel syndrome, muscle aches, back pain, neck pain, and tingling/numbness.  (AR 322.)  She also noted "perilumbar [sic] tenderness, trapezius tenderness, multiple paired trigger points," and that Ms. Mesa was anxious and agitated.  (AR

323.)  PA Pacheco's assessment included neck pain, carpal tunnel syndrome, and muscle spasms. (AR 323.)  PA Pacheco ordered an MRI and a "nerve conduction study/EMG," gave Ms. Mesa Norflex and prescribed Torodol.  (AR 323.)  On September 22, 2009, Ms. Mesa reported continued numbness in the first three fingers on her left hand as well as pain in her shoulders. (AR 320.)  PA Pacheco also identified muscle aches, joint pain, joint stiffness, and neck pain. (AR 320.)  On September 30, 2009, PA Pacheco noted that Ms. Mesa was continuing to experience neck pain.  (AR 319.)  On October 13, 2009, PA Pacheco and Ms. Mesa discussed the nerve conduction study that had been ordered the previous month as well as the possibility of surgery to improve her carpal tunnel syndrome.  (AR 317.)  PA Pacheco noted that Ms. Mesa's hand tingling and numbness had dissipated, but that she continued to suffer from muscle aches, joint pain, and joint stiffness in addition to her carpal tunnel syndrome.  (AR 317.)  PA Pacheco referred Ms. Mesa to Dr. Raymond Severt regarding the carpal tunnel syndrome surgery.  (AR 317.)

On November 19, 2009, Ms. Mesa was seen again by Dr. Joel Lewis.  (AR 315.)  Dr. Lewis noted that she was negative for tingling/numbness and swelling/bruising, but positive for muscle aches, joint paint, and joint stiffness.  (AR 315.)  His assessment listed depression, carpal tunnel syndrome, and drug abuse.  (AR 315.)  On April 5, 2010, Ms. Mesa reported continued back pain. (AR 311.)  On June 11, 2010, Ms. Mesa returned to SRCHC, but was seen by Nurse Practitioner Marina McIver who noted that Ms. Mesa had pain in her "upper neck, radiating down to mid back, and below scapular."  (AR 307-08.)  In her assessment, NP McIver concluded that Ms. Mesa was suffering from a whiplash injury to her neck due to a car accident she had been in the month before.  (AR 307.)  NP McIver referred Ms. Mesa to physical therapy at Santa Rosa Memorial Hospital.  (AR 308.)  Ms. Mesa returned to SRCHC on June 29, 2010 and was seen again by PA Pacheco who prescribed her medication for the neck pain which had resulted from the car accident.  (AR 305.)  On July 1, 2010, Ms. Mesa was seen by Dr. Lewis again, who noted her continued neck and back pain and gave her a referral for an MRI.  (AR 303.)

Ms. Mesa did not return to SRCHC until January 3, 2011, when she was again seen by Dr. Joel

Lewis for her continued back pain.  (AR 294.)  Ms. Mesa requested a note, for insurance purposes, restricting her activity until she completed physical therapy.  (AR 294.)  Dr. Lewis assessed her as suffering from low back pain and degenerative disc disease.  (AR 294-95.)  Ms. Mesa returned to SRCHC on March 11, 2011, reporting to PA Nicole Wilburn that she was "having trouble functioning" due to her pain and that the Vicodin prescribed by Dr. Lewis was ineffective.  (AR 458.)  PA Wilburn found that she had "chronic neck pain with acute exacerbation."  (AR 458.)  On November 7, 2011, Ms. Mesa visited SRCHC and was seen again by Dr. Lewis who noted that she had lingering neck pain and advised her to avoid weight lifting.  (AR 456.)

On April 3, 2012, Dr. Lewis completed a Residual Functional Capacity ("RFC") Questionnaire regarding Ms. Mesa's manipulative limitations.  (AR 590.)  He noted that she suffered from tenderness, pain, paresthesia, limitation of motion, and reduced grip strength.  (AR 590.)  He explained that fingers 1-4 in her left hand were always numb.  (AR 590.)  He also explained that all fingers in her right hand were numb, with pain after 5 minutes of keyboard use.  (AR 590.)  He limited her to less than 1 hour of grasping, turning, or twisting objects, fine finger manipulations, and arm reaching per 8-hour work day.  (AR 591.)

### b. Dr. Valerie Smith

On January 22, 2009, Ms. Mesa was seen by Dr. Valerie Smith, who filled out a Behavior Medicine Referral Form.  (AR 278.)  Dr. Smith described Ms. Mesa as "near [a] crisis state" and "in sig[nificant] need of therapy."  (AR 278.)  On August 10, 2009, Dr. Smith noted that Ms. Mesa "presented in a tense, almost hypomanic manner."  (AR 511.)  Dr. Smith's assessment included moderate recurrent major depression, as well as alcohol and amphetamine dependency, both of which she labeled as in remission.  (AR 511.)  Ms. Mesa returned two weeks later, on August 24, 2009, and Dr. Smith described her as showing "significant fatigue and pain," as well as being "very sad and lonely."  (AR 507.)  On September 8, 2009, Dr. Smith noted that she continued to suffer from moderate recurrent major depression.  (AR 504.)  On September 22, 2009, Dr. Smith noted that Ms. Mesa had accomplished a "major break-through" and exhibited an "improved sense of self-worth."  (AR 499.)  On October 6, 2009, Dr. Smith noted that Ms. Mesa showed

United States District Court
Northern District of California

"confidence and [a] sense of self," but still assessed her as suffering from moderate recurrent major depression. (AR 496.) On October 20, 2009, Dr. Smith noted her general continued improvement, decreased depressive symptoms, and increased ability to actively deal with her symptoms when they intermittently arise. (AR 492-93.) On November 17, 2009, Ms. Mesa reported feeling "empty, sad and lonely," and that her prescriptions for pain and depression seemed inadequate. (AR 490.)

Ms. Mesa visited Dr. Smith again on December 1, 2009 and reported "feeling very sad recently due to increased pain in neck and back," but also feeling grateful for having had carpal tunnel surgery on her left hand. (AR 486.) Ms. Mesa was again seen by Dr. Smith on January 5, 2010. (AR 484.) Dr. Smith noted that her depression symptoms had increased and that she was still experiencing neck and back pain. (AR 484.) On January 26, 2010, Dr. Smith wrote a letter, addressed To Whom it May Concern, explaining that she had been treating Ms. Mesa "for mental disabilities covered under the ADA" and described her as "an exemplary psychotherapy patient." (AR 291.) Dr. Smith commented that Ms. Mesa's progress had been "steady and remarkable." (AR 291.)

On October 12, 2011, Ms. Mesa returned to SRCHC for mental health services, but was seen by Dr. Stephanie Disney. (AR 449.) Ms. Mesa reported feeling stressed and depressed and Dr. Disney assessed her as having a depressive disorder. (AR 449.)

### 3. *Palm Drive Hospital* on 6/1/09 and 6/2/09

On June 1, 2009, Ms. Mesa visited Palm Drive Hospital, where she was seen by Dr. Jorge Gonzalez. (AR 255.) Ms. Mesa reported left arm numbness, and Dr. Gonzalez ordered a CT scan, which was conducted by Dr. Ingo Rencken. (AR 258.) Dr. Rencken found everything to be normal and unremarkable. (AR 258.) Ms. Mesa returned the next day, again reporting left hand numbness, and was seen by Dr. Lawrence Gettler, who noted that Ms. Mesa was "quite agitated" and that she was "thrashing in bed." (AR 253-54.) He found that there was "slight tenderness over the palmar webspace between the left thumb and left index finger" and that movement of Ms. Mesa's left arm increased her arm and hand pain. (AR 253.) He diagnosed her as suffering from

United States District Court
Northern District of California

neuropathy of the left arm/hand and anxiety with hyperventilation.  (AR 254.)  He prescribed her Motrin for her pain and recommended that she participate in drug treatment for her drug abuse problem.  (AR 253.)

### 4. *Santa Rosa Imaging Medical Center on 09/9/09*

On September 9, 2009, Ms. Mesa visited the Santa Rosa Imaging Medical Center for an MRI of her cervical spine.  (AR 340.)  Dr. Norman Silverman noted a "major protrusion" and "asymmetric compression of the ventral surface of the cervical spine cord extending toward the right neural foramen."  (AR 340.)  He also noted the narrowing of various disc spaces.  (AR 340.) He concluded that she had "multilevel discogenic disease with osteoarthritis" and "slightly increased disc prominence at C2-3 and C5-6."  (AR 341.)

### 5. *Dr. Jonathan Gonick-Hallows on 10/5/09*

On September 17, 2009, the Department of Social Services authorized a consultative psychological evaluation which was performed by Dr. Jonathan Gonick-Hallows on October 5, 2009.  (AR 608-09.)  Dr. Gonick-Hallows concluded that Ms. Mesa had post-traumatic stress disorder, depressive disorder, polysubstance dependence, mixed personality disorder, and multiple physical problems.  (AR 611.)  He noted that her conditions could cause her to have "difficulty in terms of her ability to sustain adequate interpersonal interactions."  (AR 611.)  He explained that Ms. Mesa "is able to understand and carry out simple one- and two-part instructions" and would "have marked difficulty managing the usual work-related stresses."  (AR 611.)

### 6. *Dr. Kevin Satow on 10/12/09*

On October 12, 2009, Ms. Mesa visited Dr. Kevin Satow for an electrodiagnostic evaluation. (AR 557.)  He concluded that Ms. Mesa had moderate carpal tunnel in her right arm and severe carpal tunnel in her left arm.  (AR 560.)

### 7. *Dr. Carl Fieser on 10/15/09*

On September 17, 2009, the Department of Social Services authorized a consultative neurologic examination which was performed by Dr. Carl Fieser at MDSI Physician Services on October 15, 2009.  (AR 614, 618.)  Dr. Fieser noted that Ms. Mesa had a "[h]istory of chronic

neck pain with limitations to the cervical range of motion and the presence of cervical paraspinal spasms" as well as "findings consistent with left carpal tunnel syndrome" and subjective right carpal tunnel syndrome.  (AR 618.)  He concluded that Ms. Mesa needed to be limited to lifting and carrying only "10 pounds frequently and 20 pounds occasionally."  (AR 618.)

### 8. *Dr. Raymond Severt* from 11/11/09 - 4/19/12

On November 11, 2009, Ms. Mesa visited Dr. Raymond Severt of the Santa Rosa Orthopaedic Medical Group ("SROMG") per her referral from PA Pacheco.  (AR 555, 317.)  Dr. Severt concluded that she had "severe bilateral carpal tunnel syndrome" and discussed the details and risks of carpal tunnel release surgery.  (AR 556.)  On November 20, 2009, he again noted her bilateral carpal tunnel syndrome and also found a "bilateral upper extremity myofascial strain." (AR 553.)  He also noted Ms. Mesa's "unfortunate tendency to continuously ask for narcotic pain medications."  (AR 553.)  At this point, Ms. Mesa was scheduled for carpal tunnel release surgery for her left arm.  (AR 554.)  Following this surgery, Ms. Mesa visited Dr. Severt again on December 3, 2009.  (AR 552.)  She requested, and he denied, additional narcotics.  (AR 552.)  He scheduled her to return six weeks later for consideration of carpal tunnel release surgery for her right arm.  (AR 552.)  Ms. Mesa did not return to SROMG until October 18, 2011, reporting "increasing right hand and wrist pain, numbness, and tingling."  (AR 549.)  Dr. Severt recognized a need for right carpal tunnel release surgery.  (AR 550.)

On April 19, 2012, Dr. Severt completed an RFC Questionnaire regarding Ms. Mesa's manipulative limitations.  (AR 604.)  He found that she suffered from tenderness, pain, paresthesia, muscle weakness, limitation of motion, reduced grip strength, and muscle atrophy in both hands.  (AR 604.)  He limited Ms. Mesa to two hours of grasping, turning, or twisting objects and two hours of fine finger manipulations per eight-hour work day.  (AR 605.)  On April 18, 2012, Dr. Severt completed a Restriction Status Report in which he explained that Ms. Mesa had a work restriction requiring her to be given 50% more time for typing assignments.  (AR 606.)

### 9. *Dr. L. Gottschalk* on 2/25/10

On February 25, 2010, state agency psychological consultant Dr. L. Gottschalk conducted a

United States District Court
Northern District of California

psychiatric review of Ms. Mesa.  (AR 30, 621.)  Dr. Gottschalk diagnosed Ms. Mesa as suffering from depression and anxiety disorder.  (AR 624-25.)  Dr. Gottschalk explained that Ms. Mesa was mildly limited with regards to activities of daily living and maintaining concentration, persistence, or pace and was moderately limited regarding social functioning.  (AR 629.)  Dr. Gottschalk also completed a Case Analysis, finding that Ms. Mesa's allegations were "partially credible," but her allegations of the severity of her conditions was "not fully supported" by the medical records. (AR 637-41.)

### 10.  Dr. P. Bianchi *on 2/25/10*

Also on February 25, 2010, state agency medical consultant Dr. P. Bianchi completed a Physical RFC Assessment.  (AR 28, 632-36.)  Dr. Bianchi concluded that Ms. Mesa had various exertional and manipulative limitations and concluded that these findings were consistent with those of Ms. Mesa's treating/examining physicians.  (AR 632-36.)

### 11. Santa Rosa Memorial Hospital, Rohnert Park Urgent Care/Healthcare Center *from 5/31/10 - 3/21/11*

On May 31, 2010, Ms. Mesa visited Santa Rosa Memorial Hospital's Rohnert Park Urgent Care/Healthcare Center ("RPUC/HC"), where she was seen by Dr. Robert Koida.  (AR 433.)  Dr. Koida determined that Ms. Mesa was suffering from acute upper back pain and prescribed her Vicodin for pain and Flexeril for muscle spasms/stiffness.  (AR 432-33.)  Ms. Mesa returned to RPUC/HC on March 5, 2011 complaining of neck, shoulder, and back pain.  (AR 412.)  She was seen by Dr. Micheline Cavallacci, who diagnosed her as suffering from cervical spasms and upper back pain.  (AR 412.)  Dr. Cavallacci prescribed Norco for pain and Flexeril for muscle spasms/stiffness.  (AR 415.)  Ms. Mesa returned to RPUC/HC just a few days later, on March 9, 2011, and was seen by PA Christi Cannon.  (AR 420.)  Ms. Mesa reported neck and arm pain. (AR 420.)  PA Cannon diagnosed her as suffering from muscle spasms and cervical radiculopathy. (AR 420.)  PA Cannon ordered an x-ray, which was reviewed by Dr. Craig Polson, who found osteopathic foraminal narrowing.  (AR 424.)  On March 14, 2011, PA Cannon determined that Ms. Mesa was suffering from cervical pain, for which she prescribed Norco.  (AR 416, 419.)  Ms.

United States District Court
Northern District of California

1    Mesa's final visit to RPUC/HC was on March 21, 2011, when she was seen by Dr. Patricia Stagg.

2    (AR 408.)  Dr. Stagg diagnosed Ms. Mesa as suffering from cervical radiculopathy for which she

3    prescribed Norco.  (AR 408, 411.)

4        **12. Dr. S. Amon** on 7/1/10

5        On July 1, 2010, a Physical RFC Assessment was completed by state agency medical

6    consultant Dr. S. Amon.  (AR 28, 642-46.)  Like Dr. P. Bianchi, Dr. S. Amon found that Ms. Mesa

7    had various exertional limitations.  (AR 643.)  Dr. Amon did not, however, find any manipulative

8    limitations.  (AR 644.)  Dr. Amon concluded that Ms. Mesa's "[a]llegations of back and neck pain

9    and cts [were] partially credible."  (AR 646.)  He noted that she had "some back pain and spasms,

10   neck pain, and bilat[eral] hand pain and numbness."  (AR 646.)  He additionally concluded that

11   these findings were consistent with those of Ms. Mesa's treating/examining physicians.  (AR 646.)

12   Dr. Amon also completed a Case Analysis, finding Ms. Mesa's allegations regarding her

13   conditions to be "partially credible."  (AR 647-50.)

14       **13. Dr. H. Pham** on 2/11/11

15       On February 11, 2011, another Physical RFC Assessment was completed by state agency

16   medical consultant Dr. H. Pham.  (AR 28, 349-53.)  Dr. Pham found various exertional, postural,

17   and manipulative limitations.  (AR 349-53.)  Dr. Pham did not, however, have any statements

18   from Ms. Mesa's treating/examining physicians to use for comparative purposes.  (AR 353.)

19       **14. Health Analysis, Inc.** on 2/22/11

20       On February 22, 2011, a Psychological Disability Evaluation was conducted by Drs. Jacklyn

21   Chandler and Paul Martin of Health Analysis, Inc.  (AR 354.)  Ms. Mesa reported "numerous

22   injuries to her back, neck, and head" as well as depression and anxiety.  (AR 354.)  Ms. Mesa also

23   reported a history of alcohol and drug use, but stated that she had been clean and sober since 2009.

24   (AR 355.)  Drs. Chandler and Martin noted that Ms. Mesa's "thought content was logical" and that

25   "[h]er insight and judgment appeared to be intact," but that "she demonstrated mildly fluctuating

26   attention and concentration."  (AR 355.)  Drs. Chandler and Martin conducted WAIS-IV, WMS-

27   IV, Trail-Making, and Bender-Gestalt-II tests.  (AR 356.)  On the WAIS-IV test, Dr. Chandler

28

United States District Court
Northern District of California

found that her "overall intellectual ability [was] within the average range," but noted a "relative weakness in the area of spatial organization skills." (AR 356.) On the WMS-IV test, Ms. Mesa's "performance suggest[ed] adequate memory function." (AR 356.) Ms. Mesa's performance on the Trail-Making test indicated "adequate sequencing ability, visual scanning speed, psychomotor speed, and the ability to make cognitive shifts." (AR 356.) Ms. Mesa's score on the Bender-Gestalt Test-II was "in the average range" and her performance showed "adequate visuconstruction ability." (AR 356.)

Drs. Chandler and Martin found that Ms. Mesa appeared to meet the criteria for "DSM-IV-TR diagnoses of Pain Disorder Associated With Both Psychological Factors and Chronic Pain and Depressive Disorder." (AR 356.) Drs. Chandler and Martin concluded by explaining:

> [Ms. Mesa] appears capable of understanding, remembering, and carrying out simple, one and two step instructions. She appears capable of understanding and remembering detailed and complex instructions. She may have mild difficulty carrying out complex job instructions. She appears capable of adapting to changes in routine work settings. She may have mild difficulty maintaining attention and concentration. She appears capable of maintaining pace and persistence.
>
> She is likely to have moderate difficulty functioning under normal stress in a work setting. She had mild difficulty interacting appropriately with this examiner due to psychiatric symptoms. She is likely to have mild to moderate difficulty relating to and interacting with supervisors and co-workers. She is likely to have mild to moderate difficulty dealing with the public.

(AR 357.)

### 15. Petaluma Health Center on 3/11/11

On March 11, 2011, Ms. Mesa visited the Petaluma Health Center ("PHC") and was seen by Dr. Kambria Beck Holder. (AR 360.) Ms. Mesa reported neck and shoulder pain. (AR 360.) Dr. Holder found that Ms. Mesa had "tense, tender myofascial tension" in her trapezius and neck. (AR 361.) Dr. Holder also noted that Ms. Mesa cried while discussing her pain and that she seemed to be suffering from moderate depression. (AR 361.)

### 16. Dr. Norman Zukowsky on 3/29/11

On March 29, 2011, state agency psychological consultant Dr. Norman Zukowsky completed a

1    Psychiatric Review Technique for Ms. Mesa.  (AR 31, 366.)  He concluded that she had mild

2    limitations in terms of the activities of daily living, maintaining social functioning, and

3    maintaining concentration/persistence/pace, but ultimately described her overall impairments as

4    non-severe.  (AR 366, 374.)

5         ***17.  V. Capurso*** *on 4/4/11*

6         On April 4, 2011, V. Capurso (who may also be a state agency medical consultant) completed

7    a Case Analysis.  (AR 377-80.)  V. Capurso found Ms. Mesa to be "[f]airly credible," but

8    concluded that while the medical record support her allegations, her conditions were "not so

9    severe as to prevent work."  (AR 379.)

10        ***18. Dr. S. Reagan*** *on 7/6/11*

11        On July 6, 2011, state agency psychological consultant Dr. S. Reagan reviewed the medical

12   record and completed a Disability Determination Explanation form.  (AR 61-72.)  Dr. Reagan

13   found that although Ms. Mesa had made remarkable progress since getting clean and sober, she

14   still suffered from "moderate depression."  (AR 66.)  Dr. Reagan found that Ms. Mesa had mild

15   restrictions on engaging in the activities of daily living, moderate difficulties maintaining social

16   functioning, and mild difficulties maintaining concentration, persistence, or pace.  (AR 67.)  Dr.

17   Reagan also found that Ms. Mesa's abilities to "complete a normal workday and workweek

18   without interruptions from psychologically based symptoms," to "interact appropriately with the

19   general public," and to "maintain socially appropriate behavior" were all moderately limited.  (AR

20   69.)  Dr. Reagan found that Ms. Mesa could perform "simple and detailed tasks with limited

21   contact with the public" but that it was "unlikely that she would be able to sustain complex tasks."

22   (AR 66-67.)  Dr. Reagan additionally explained that Ms. Mesa could do "simple 1 and 2 step

23   instructions."  (AR 70.)  Dr. Reagan concluded that there was one or more medically determinable

24   impairment that could reasonably be expected to produce Ms. Mesa's symptoms and that Ms.

25   Mesa's statements about the intensity, persistence, and functionally limiting effects those

26   symptoms was substantiated by the objective medical evidence.  (AR 68.)

27   *//*

28

1

### 19. *Dr. Thomas Keller* from 7/6/11 – 4/3/12

2

On July 6, 2011, on a referral from PHC's Dr. Holder, Ms. Mesa visited Dr. Thomas Keller,

3

who determined that she was suffering from cervical degenerative disc disease and bilateral

4

cervical radiculopathy.  (AR 584-87.)  He prescribed Soma and Vicodin as well as cervical

5

traction to be conducted by a physical therapist, and also noted the possibility of giving her a

6

cervical epidural injunction at some point in the future.  (AR 587.)  On August 31, 2011, Dr.

7

Keller noted that she had right neck tenderness, limited cervical extension, and mild hypesthesia in

8

both hands.  (AR 583.)  He encouraged her to continue taking her medications and engaging in an

9

exercise program at a health club to improve her condition and increase her flexibility.  (AR 583.)

10

On September 14, 2011, Ms. Mesa returned to Dr. Keller and reported having strained her neck

11

the day before.  (AR 582.)  He found that her cervical extension was completely limited at 0

12

degrees, that she was experiencing palpable posterior cervical muscle spasms, and that she had

13

tingling dysesthesias in the fingers of both hands.  (AR 582.)  He added an acute cervical strain to

14

his previous diagnoses, for which he gave her a Toradol injection and prescribed her Percocet.

15

(AR 582.)  Ms. Mesa returned two weeks later, on September 28, 2011, and Dr. Keller noted that

16

she was "doing much better," having recovered from the cervical strain treated at her previous

17

visit.  (AR 581.)  Dr. Keller additionally noted, however, that she continued to suffer from all of

18

the previously diagnosed injuries.  (AR 581.)

19

On November 23, 2011, Dr. Keller concluded that Ms. Mesa had mild hypesthesia in her left

20

hand and palpable tightness in her left shoulder.  (AR 578.)  He prescribed her Norco and hoped to

21

be able to provide her with a cervical epidural injection a few weeks later.  (AR 578.)  Ms. Mesa

22

returned on December 19, 2011, at which time Dr. Keller found that she still had hypethesia in her

23

left hand and tightness in her left shoulder.  (AR 578.)  He also found that she had posterior neck

24

tenderness.  (AR 578.)  He increased in her Vicodin and Norco prescriptions and tentatively

25

scheduled her for a cervical epidural injection.  (AR 578.)  Ms. Mesa was seen by Dr. Keller again

26

on January 13, 2012, and reported that her pain medication regimen was effective and allowed her

27

to intern at a homeless shelter.  (AR 575.)  Dr. Keller noted that her neck tenderness and left hand

28

United States District Court
Northern District of California

hypesthesia persisted and that she still suffered from cervical degenerative disc disease and left radiculopathy. (AR 575.) On February 24, 2012, Ms. Mesa reported that her Vicodin was causing her gastric discomfort, so Dr. Keller told her to stop taking it, but to continue with the Norco. (AR 576. Ms. Mesa returned on March 23, 2012. (AR 574.) In addition to the neck tenderness and left hand hypesthesia identified at previous visits, Dr. Keller noted that she had mid-thoracic tenderness which increased with inhalation. (AR 574.) Dr. Keller determined that this might be pleurisy and prescribed her Percocet. (AR 574.)

On April 3, 2012, Dr. Keller completed a Cervical Spine RFC Questionnaire for Ms. Mesa. (AR 594-98.) Dr. Keller explained that his diagnosis was that she suffered from cervical spondylosis and bilateral cervical radiculopathy. (AR 594.) He noted that she suffered from chronic pain/paresthesia and had significant limitations of motion. (AR 594.) He also noted Ms. Mesa's depression and anxiety, which he said contributed to the severity of her symptoms. (AR 596.) He explained that her symptoms were "frequently" severe enough to interfere with the attention and concentration required to perform "simple work tasks." (AR 596.) He further noted various limitations on Ms. Mesa's ability to walk, sit, and stand for long periods. (AR 596-97.) He noted additional limitations on her ability to carry 10 pounds or more, turn her head in various directions, twist/bend/crouch, and climb ladders/stairs. (AR 597-98.)

### B.  The Vocational Expert's Testimony

VE Ms. Sandra Trost testified before the ALJ at the hearing conducted on May 30, 2012. (AR 20, 51.) The ALJ asked the VE whether an individual limited to light work, with no more than occasional fine or gross manipulation with either hand, would be able to perform Ms. Mesa's past jobs. (AR 51.) These past jobs included retail/cashiering work at Pep Boys and Office Max, and the VE determined that such an individual would be unable to perform them because they would require "frequent use of the hands." (AR 51.)

The ALJ then asked whether someone limited to "no more than occasional use of the hands" might be able to perform other jobs in the economy. (AR 51.) The VE responded by mentioning three positions: 1) counter clerk (DOT# 249.366-010), with a light exertional level, 2) bakery

worker conveyor line (DOT# 54.687-022), with a light exertional level and SVP at 2, and 3)

surveillance systems monitor (DOT# 379.367-010), at the sedentary level and SVP at 2.  (AR 52.

The VE then clarified that only the surveillance systems monitor position could be performed with

less than occasional hand manipulation.  (AR 52.)  Regarding the national availability of these

positions, the VE testified that there were 176,400 counter clerk positions, 11,655 bakery worker

conveyor line positions, and 98,026 surveillance systems monitor positions.  (AR 52.)

Ms. Mesa's representative, Dr. Dan McCaskell, then questioned the VE.  Dr. McCaskell added

to the ALJ's hypothetical that the person could not work more than four hours in an eight-hour

work day, and the VE stated that such a person would be unable to meet the requirements of the

surveillance systems monitor positions.  (AR 53.)  Dr. McCaskell also asked if the person would

be able to maintain employment if the person was absent more than three days per month, to

which the VE responded that the person would not.  (AR 53.)

**C.  The Testimonial Evidence Provided by Ms. Mesa**

Ms. Mesa provided testimonial evidence both before and at the ALJ's hearing.

*1. Pre-Hearing Testimony*

On January 6, 2011, SSA claims representative L. Zabatta filled out a Disability Report based

on statements made by Ms. Mesa at an SSA field office.  (AR 31, 166-70.)  L. Zabatta noted that

Ms. Mesa was "pleasant and cooperative," but did not understand the disability appeal process.

(AR 169.)  Ms. Mesa's friend Mona Ponsetto completed a Third Party Function Report on

February 16, 2011, providing various details about Ms. Mesa's daily living.  (AR 181-88.)  Ms.

Ponsetto explained that Ms. Mesa lived alone except for when she had her son with her several

times a year.  (AR 181.)  Ms. Ponsetto noted that Ms. Mesa "watches movies and visits socially

with others," but also said that she did so "hardly at all anymore."  (AR 185.)  Ms. Ponsetto also

noted Ms. Mesa's ability care for her pet cat, drive a car, and shop for food and household items.

(AR 182, 184.)

On February 21, 2011, Ms. Ponsetto filled out a Function Report on behalf of Ms. Mesa.  (AR

201-08.)  Ms. Mesa expressed having difficulty using buttons, grasping items, and caring for her

1  hair.  (AR 202.)  Ms. Mesa also stated that she used to love to cook, but now mostly ate "easy to

2  fix" and "prepared foods."  (AR 203.)  Ms. Mesa also said she was able to "comprehend written

3  instruction fairly well," and "follow spoken instruction ok, as long as it is direct and simple, not

4  complicated."  (AR 206.)  Socially, Ms. Mesa explained that she spent time with Ms. Ponsetto,

5  went to AA meetings, and attended school.  (AR 205.)

6       *2. Hearing Testimony*

7       Ms. Mesa also testified before the ALJ at the hearing conducted on May 30, 2012.  (AR 46.)

8  Ms. Mesa testified about employment history, stating that in 2007 she had held a seasonal, part-

9  time inventory position which required a lot of lifting and use of her fingers.  (AR 46-47.)  Ms.

10  Mesa's hand-related symptoms progressed to the point where she had to stop working in this

11  capacity because she "simply couldn't do it" anymore.  (AR 47.)  Ms. Mesa explained that her

12  physical inability to work caused her to suffer from depression.  (AR 47.)  Her conditions were

13  also exacerbated by injuries to her back and neck.  (AR 47-48.)  Ms. Mesa also suffered from

14  carpal tunnel syndrome, which further limited her use of her hands.  (AR 48.)

15       At the time of the hearing, Ms. Mesa had a 12-hour a week job as a dressing room greeter.

16  (AR 48-49.)  In that position, she handed numbered paddles to customers based on the number of

17  items they wished to try on and called co-workers via a walkie-talkie to have them redistribute the

18  items that were not purchased.  (AR 49.)  Ms. Mesa said that she essentially served as "a friendly

19  theft deterrent."  (AR 49.)

20       Ms. Mesa additionally testified that she was in school, which she was able to attend full-time

21  with the school's Disability Resource Department granting her 50% more time to complete

22  assignments than other students.  (AR 50.)  She had also received training on Dragon Speak and

23  Spell (voice dictation software) so that she could reduce the need to use her hands to complete

24  these assignments.  (AR 50.)

25  **D. The ALJ's Findings**

26       Applying the sequential evaluative process, on June 8, 2012, the ALJ held that Ms. Mesa was

27  not disabled under § 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act and therefore

28

United States District Court
Northern District of California

was not entitled to disability insurance benefits.  (AR 17, 20.)  Preliminarily, the ALJ found that Ms. Mesa met the Social Security Act's insured status requirements through March 30, 2012.  (AR 22.)

Applying Step One of the five-step sequential process, the ALJ found that Ms. Mesa had not engaged in any substantial gainful activity since November 1, 2007, the alleged disability onset date.  (AR 22.)

At Step Two, the ALJ found that Ms. Mesa suffered from the following severe impairments: 1) status-post carpal tunnel release, 2) degenerative joint disease of the cervical spine and lumbar spine, 3) a somatoform disorder, 4) an affective disorder, 5) an anxiety-related disorder, 6) a personality disorder, and 7) a substance addiction disorder reported to be sustained remission since 2009.  (AR 23.)

At Step Three, the ALJ found that Ms. Mesa did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the listed impairments.  (AR 23.)

The ALJ then determined Ms. Mesa's residual functional capacity ("RFC") in order to assess at Steps Four and Five whether she could perform his past relevant work or any other work considering his age, education, and work experience.  The ALJ found that Ms. Mesa had the RFC to perform light work (as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)), except that she could "occasionally engage in fine and gross manipulation" with both hands.  (AR 26.)  The ALJ also found that, non-exertionally, Ms. Mesa retained "the ability to engage in at least simple, repetitive tasks equating to unskilled work."  (AR 26.)

In making this RFC finding, the ALJ considered all of Ms. Mesa's symptoms and how consistent they were with the objective medical evidence and other evidence (based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Rulings 96-4p and 96-7p).  (AR 27.)  The ALJ also considered opinion evidence (based on the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p).  (AR 27.)  The ALJ followed a two-step process.  First, he determined whether there was an underlying

United States District Court
Northern District of California

1   medically determinable physical or mental impairment that could reasonably be expected to

2   produce the type of the claimant's symptoms.  (AR 27.)  Second, he evaluated the intensity,

3   persistence, and limiting effects of those symptoms to determine the extent to which they limited

4   Ms. Mesa's functioning.  (AR 27.)  For the second part, the ALJ said that whenever Ms. Mesa's

5   statements about the intensity or functionally limiting effects of pain or other symptoms were not

6   substantiated by objective medical evidence, he made findings on the credibility of the statements

7   based on the "entire case record."  (AR 27.)

8       After summarizing the chronological development of Ms. Mesa's conditions, the ALJ turned

9   to the medical evidence, assessing each piece of evidence in turn.

10      The ALJ gave only "some weight" to the October 2009 consultative examination performed by

11  Dr. Fieser, the determinations made by Dr. P. Bianchi in February of 2010, and the July 2010

12  examination by Dr. S. Amon, finding that other evidence supported greater limitations than they

13  described.  (AR 28.)  The ALJ also gave "reduced weight" to Dr. Pham, who the ALJ said failed

14  to reasonably consider other medical assessments and Ms. Mesa's self-reported pain and

15  limitations.  (AR 28.)  The ALJ also only gave "little weight" to the opinions of Dr. Keller, finding

16  them generally to be "inconsistent with and not supported by the record as a whole."  (AR 29.)

17  The ALJ specifically noted that Dr. Keller's diagnosis of cervical spondylosis seemed

18  "inconsistent with [Ms. Mesa's] prior medical history and objective diagnostic imaging."  (AR

19  29.)  Turning to the opinions expressed by Dr. Lewis, the ALJ gave them "reduced weight" as

20  well, finding them "unsupported by the record."  (AR 29.)  The ALJ explained that Dr. Lewis had

21  opined that Ms. Mesa could engage in fine manipulation for only less than one hour in an eight-

22  hour day.  (AR 29.)  The ALJ found this inconsistent with the fact, noted by Dr. Lewis, that Ms.

23  Mesa was "spending substantial time studying and typing papers."  (AR 29.)  The ALJ assumed,

24  without citing to any evidence, that Ms. Mesa "was typing, at least occasionally, more than one

25  hour in a day."  (AR 29-30.)

26      Turning to Ms. Mesa's psychiatric impairments, the ALJ gave Dr. Gonick-Hallows's opinions

27  "reduced weight," noting Ms. Mesa's "abstention from the use of alcohol and amphetamines, and

28

United States District Court
Northern District of California

the concurrent withdrawal symptoms." (AR 30.) The ALJ found "no probative evidence to support a finding of significant limitations in social functioning" and thus gave the assessment of Dr. Gottschalk, which was affirmed by Dr. Amon, "reduced weight in this respect." (AR 30.) The ALJ also found a lack of a probative evidence for the social limitations described by Dr. Chandler as well as rejecting "her provisional diagnosis of a cognitive disorder," which the ALJ found to be "not supported by the record." (AR 31.) The ALJ also found a lack of support for the assessment of Dr. Reagan, and thus only assigned it "some weight." (AR 31.)

The ALJ gave "considerable weight" to Dr. Severt's opinions, finding that they were "generally supported by the record" and reasonably factored in Ms. Mesas' statements regarding her subjective pain and limitations. (AR 30.) The ALJ also gave "significant weight . . . to the characterization and improvement in [Ms. Mesa's] symptoms" by Dr. Smith. (AR 30.) The ALJ noted that Dr. Zukowsky took issue with Dr. Chandler's diagnosis of a cognitive disorder, but did not discuss how much weight he gave to this opinion. (AR 31.) The ALJ also mentioned the findings of Dr. Holder, but did not discuss how much weight was given to her conclusions. (AR 29.)

Considering all the evidence, the ALJ concluded that Ms. Mesa's "medically determinable impairments could reasonably be expected to cause the type of alleged syndromes," but that Ms. Mesa's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not found credible to the extent they are inconsistent with . . . the record as a whole." (AR 31.)

Moving on to Step Four, the ALJ found that Ms. Mesa was unable to perform any past relevant work. (AR 32.)

At Step Five, the ALJ noted that Ms. Mesa was a "younger individual" as defined by C.F.R. §§ 404.1563 and 416.963, that she had at least a high school education, and that she was able to communicate in English. (AR 32.) He also noted that the potential transferability of job skills was not material as the use of the Medical-Vocational Rules supported a finding that Ms. Mesa was not disabled regardless of whether or not she had any transferable job skills. (AR 32.) The

ALJ explained that he asked the VE whether jobs existed in the national economy for someone with Ms. Mesa's RFC, age, education, and work experience.  (AR 33.)  The VE identified the occupations of counter clerk (DOT# 249.366-010), bakery worker (DOT# 524.687-022), and security systems monitor (DOT# 379.367-010).  (AR 33.)  The ALJ determined that these jobs existed in significant numbers in the national economy and noted that the VE's testimony regarding the number of such jobs was consistent with the DOT.  (AR 33.)

The ALJ thus concluded that Ms. Mesa was not disabled as defined by the Social Security Act at any time from November 1, 2007 through the date of the ALJ's decision.  (AR 33.)

## ANALYSIS

Ms. Mesa challenges the ALJ's decision on three grounds: (1) the ALJ wrongfully rejected some limitations supported by medical evidence and failed to address others; (2) the ALJ failed to give clear and convincing reasons for rejecting Ms. Mesa's testimony; and (3) the ALJ wrongfully accepted vocation evidence which did not conform to administratively noticed sources.

## I.  LEGAL STANDARD

### A.  Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

//

United States District Court
Northern District of California

1

**B.  Applicable Law: Five Steps to Determine Disability**

2      An SSI claimant is considered disabled if (1) he suffers from a "medically determinable

3   physical or mental impairment which can be expected to result in death or which has lasted or can

4   be expected to last for a continuous period of not less than twelve months," and (2) the

5   "impairment or impairments are of such severity that he is not only unable to do his previous work

6   but cannot, considering his age, education, and work experience, engage in any other kind of

7   substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) &

8   (B).

9      The Social Security regulations set out a five-step sequential process for determining whether

10   a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.

11   The five steps are as follows:

12      **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the

13      claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a

14      substantially gainful activity, then the claimant's case cannot be resolved at step one, and the

15      evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(i).

16      **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the

17      claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. §

18      404.1520(a)(4)(ii).

19      **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments

20      described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the

21      claimant's impairment does not meet or equal one of the impairments listed in the regulations,

22      then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20

23      C.F.R. § 404.1520(a)(4)(iii).

24      **Step Four.**   Considering the claimant's RFC, is the claimant able to do any work that he or

25      she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.

26      If the claimant cannot do any work he or she did in the past, then the case cannot be resolved

27      at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. §

28

United States District Court
Northern District of California

404.1520(a)(4)(iv).

**Step Five.**  Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

## II. APPLICATION

### A.  The ALJ Did Not Provide Clear and Convincing Reasons for Rejecting Ms. Mesa's Social Limitations

An ALJ errs by failing to incorporate all of a claimant's limitations into the RFC determination.  *See Samples v. Comm'r of Soc. Sec.*, 466 Fed. Appx. 584, 586 (9th Cir. 2012); *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 690 (9th Cir. 2009). Here, the ALJ erred by improperly discounting certain evidence and thus failing to include all of Ms. Mesa's limitations in the RFC.

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  As a rule, the Social Security Administration favors opinions of examining physicians over non-examining physicians.  *See* 20 C.F.R. § 404.1527; *see also Penny v. Sullivan*, 2 F.3d 953, 957 (9th Cir. 1993) (finding a medical opinion "to be of very limited value" because the doctor had "never personally examined" the claimant).  When an examining physician's opinion is uncontradicted, "the Commissioner must provide "clear and convincing" reasons for rejecting" it.  *Lester v.*

1   *Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996).

2      Here, examining psychologist Dr. Jonathan Gonick-Hallows found that Ms. Mesa had

3   "difficulty in terms of her ability to sustain adequate interpersonal interactions."  (AR 611.)

4   Examining Drs. Chandler and Martin found that Ms. Mesa was "likely to have mild to moderate

5   difficulty relating to and interacting with supervisors and co-workers," and also "mild to moderate

6   difficulty dealing with the public."  (AR 357.)  The opinions of these examining physicians were

7   not contradicted.  Non-examining physicians Drs. Reagan and Gottschalk also found Ms. Mesa to

8   suffer from social limitations.  (*See* AR 67 (noting Ms. Mesa's "moderate difficulties maintaining

9   social functioning"); AR 629 (finding Ms. Mesa "moderately limited regarding social

10   functioning").)  Non-examining physician Dr. Zukowsky equivocated somewhat on the issue,

11   finding these limitations to be "poorly supported by data," but still noted Ms. Mesa's "mild

12   limitations in terms of . . . maintaining social functioning").  (AR 380, 374.)

13      Despite these consistent medical opinions, the ALJ stated that there was "no probative

14   evidence in the record to support significant limitations in social functioning."  (AR 30.)  The ALJ

15   did not discuss why these medical opinions were not probative or what type of evidence he might

16   have considered probative.  This supposed lack of probative evidence thus is not a clear reason for

17   the ALJ's refusal to incorporate the proposed social limitations into Ms. Mesa's RFC.  The

18   Commissioner points to a variety of facts to explain and justify the ALJ's rejection of Ms. Mesa's

19   social limitations.  (ECF No. 22 at 3-5.)  While these facts are clear, they are not convincing.

20      The Commissioner emphasizes that Ms. Mesa "regularly attended AA meetings, socialized

21   with friends, had a boyfriend, and she even travelled to Texas to see her son."  (ECF No. 22 at 5.)

22   AA attendance, however, proves only that: attendance.  While AA meetings have a social nature to

23   them, attendance alone does not show significant participation or any other meaningful form of

24   socialization.  Another court to have addressed this issue found moderate social functioning

25   limitations despite attendance at AA meetings.  *Cordova v. Colvin*, 2013 WL 5379491, at *4 (C.D.

26   Cal. Sept. 24, 2013).

27      The Commissioner points out that Ms. Ponsetto explained in her Function Report that Ms.

28

United States District Court
Northern District of California

Mesa "visits socially with others," but fails to recognize that Ms. Ponsetto immediately thereafter explained that Ms. Mesa does so "[h]ardly at all anymore." (ECF No. 22 at 5; AR 185.) Remembering its duty to consider "both the evidence that supports and that which detracts from the ALJ's conclusion," *Andrews*, 53 F.3d at 1039, the court cannot rely on the statement quoted by the Commissioner while ignoring the statement made on the very next line of the cited document. Read together, these two statements do not provide support for the ALJ's conclusion.

The Commissioner notes that Ms. Mesa at one point stated she had a boyfriend. (ECF No. 22 at 5; AR 300.) However, just as "[o]ne does not need to be "utterly incapacitated" in order to be disabled," one should not need to be utterly isolated in order to be considered socially limited, and "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Additionally, romantic relationships are simply not comparable to professional interactions. Ms. Mesa's participation in one personal and intimate relationship thus does not suggest that she did not suffer from significant limitations in her ability to interact with coworkers and the public at large. Ms. Mesa's visit to see her son in Texas is unconvincing for similar reasons.

The Commissioner also points out that Ms. Mesa "attended college full-time while working parttime." (ECF No. 22 at 6.) The demands of school attendance, however, are not the same as the demands of working. *Kish v. Colvin,* 552 F. Appx. 650, 651 (9th Cir. 2014). Additionally, the Commissioner has failed to describe any meaningful socialization which Ms. Mesa engaged in as a student. As with AA meetings, there is typically a social component to school attendance, but that Ms. Mesa attended school does not mean or even imply that she participated in these social components, much less that she did so in a manner which would weaken the otherwise overwhelming medical evidence. The fact that Ms. Mesa worked part-time is similarly unpersuasive without any evidence that her employment involved anything more than perfunctory and repetitive social interaction. (*See* AR 49 (Ms. Mesa's part-time employment involved "hand[ing] out number paddles for the items of clothing that the customers come in with" and

United States District Court
Northern District of California

1 | "call[ing] in some of the other associates [to] distribute the clothing out onto the floor").)  This

2 | especially true given that Ms. Mesa's current employment is only part-time and she is given extra

3 | breaks by her superiors.  (AR 48.)

4 |     The ALJ did state that even if significant social limitations were warranted, Ms. Mesa would

5 | still be able to perform jobs existing in significant numbers in the national economy.  (AR 30.)

6 | The ALJ explained that the unskilled jobs the VE found Ms. Mesa capable of "ordinarily involve

7 | dealing primarily with objects, rather than . . . people."  (AR 32.)  However, where the VE's

8 | testimony was in response to a hypothetical question based on a defective RFC, remand is

9 | appropriate for the RFC to be reformulated to include all of the claimant's limitations.  *See*

10 | *Samples*, 466 F. Appx. at 586.

11 |     Ms. Mesa also asserts that the ALJ failed to address the limitation to "simple 1 and 2 step

12 | instructions" called for by Drs. Reagan, Chandler, and Martin.  (ECF No. 21 at 9.)  As the

13 | Commissioner points out, however, it is unclear if Dr. Reagan intended to limit Ms. Mesa to only

14 | one- and two-step instructions given that he additionally found her capable of both detailed and

15 | complex tasks.  (ECF No. 22 at 5, AR 67.)  Regardless of this lack of clarity, the ALJ did address

16 | Dr. Reagan's opinion, assigning it "some weight."  (AR 31.)  Additionally, as Ms. Mesa herself

17 | pointed out, "Drs. Chandler and Martin equivocated on the limitation to one- and two-step

18 | instructions."  (ECF No. 21 at 11-12.)  And again, the ALJ did address these limitations, noting

19 | that Drs. Chandler and Martin found Ms. Mesa capable of "carrying out simple instructions, as

20 | well as detailed and complex instructions."  (AR 31.)  Ms. Mesa is simply mistaken in arguing that

21 | the ALJ failed to address these limitations, and the alternate statements made by these physicians

22 | constituted clear and convincing reasons for the ALJ's rejection of them.

23 | **B.  The ALJ Failed to Give Clear and Convincing Reasons for Rejecting Ms. Mesa's**

24 | **Testimony But the Credit-as-True Rule Does Not Apply**

25 |     Where a claimant has (1) presented the requisite objective medical evidence and there is (2) no

26 | evidence of malingering, an ALJ may only reject a claimant's subjective testimony about

27 | symptoms with (3) specific, clear, and convincing reasons. *See Chaudry v. Astrue*, 688 F.3d 661,

28 |

United States District Court
Northern District of California

670-71 (9th Cir. 2012).  An ALJ must identify the testimony that is not credible as well as the evidence that undermines the complaints.  *See Reddick*, 157 F.3d at 722.  Here, the ALJ erred by failing to provide specific, clear, and convincing reasons for rejecting of Ms. Mesa's testimony.

The ALJ found that Ms. Mesa's "medically determinable impairments could reasonably be expected to cause the type of alleged symptoms," but found that her "statements concerning . . . the limiting effects of [her] symptoms" were not credible.  (AR 31.)  With the first prong satisfied and because there was no evidence of malingering, the ALJ should have cited specific, clear, and convincing reasons for rejecting Ms. Mesa's testimony.  The ALJ erred by, rather than pointing to any specific inconsistencies or contradictions which he believed made Ms. Mesa less credible, only referencing "the factors discussed above and the record as a whole."  (AR 31.); *see Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (explaining that "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony"); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (emphasizing that it is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible").

The Commissioner points to a variety of activities which she claims are "directly at odds" with Ms. Mesa's "allegations of disabling mental dysfunction" and which supposedly show that Ms. Mesa "exaggerated the limiting effects" of her physical impairments.  (ECF No. 22 at 7, 9.)  The Commissioner does not, however, specify which of Ms. Mesa's statements these activities are intended to contradict.  The court declines the opportunity to scour the record for testimony which might be contradicted by these activities in order to make up for the ALJ's error.

Ms. Mesa and the Commissioner dispute whether, given this error, the court should remand for an immediate award of benefits or for further administrative proceedings.  (ECF No. 21 at 14-15; ECF No. 22 at 10-11.)  The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits."  *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).  For this credit-as-true rule to be applied, it must be true that "(1) the record has been fully developed and

United States District Court
Northern District of California

further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.*

Ms. Mesa asserts that the court should apply the credit-as-true rule and remand for an immediate award of benefits. (ECF 21 at 15.) Ms. Mesa does not, however, actually state that the three prongs of the credit-as-true rule are satisfied in this case. The Commissioner also fails to address whether the rule is satisfied here, instead asking the court to exercise discretion and decline to apply it because "the record raises serious doubts as to whether [Ms. Mesa] is disabled." (ECF No. 22 at 10-11.) Ultimately, because this case does not satisfy all three prongs of the rule, the court will not apply it here.

As discussed above, the ALJ failed to provide legally adequate reasons for his rejection of Ms. Mesa's testimony, and the second prong of the credit-as-true rule is thus satisfied. The first and third prongs are logically intertwined and unsatisfied here. Courts have found these prongs satisfied where VE's have addressed the limitations mistakenly found not to be credible by the ALJ or where the Commissioner has conceded that someone with such limitations would be disabled. *See Garrison*, 759 F.3d 995*; Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007). In these cases, the determination has been made that someone with the claimant's asserted limitations would be disabled, thus satisfying the third prong and eliminating any need for further development of the record, thus satisfying the first prong. Here, however, neither the VE nor the Commissioner have found that someone with Ms. Mesa's alleged limitations would be disabled. The court therefore cannot say that Ms. Mesa's improperly discredited testimony necessitates the award of benefits. Additional development of the record is needed for that determination to be made.

### C. The ALJ's Reliance on the VE's Testimony Was Appropriate

Ms. Mesa finally contends that the ALJ wrongfully relied on the testimony of the VE despite the fact that it conflicted with a source of administrative notice. (ECF No. 21 at 15.) Ms. Mesa

United States District Court
Northern District of California

1    recognizes that the Dictionary of Occupational Titles ("DOT"), relied on by the VE at the hearing

2    before the ALJ, is a source of administrative notice.  (ECF No. 21 at 15-16.); 20 C.F.R. §

3    404.1566(d).  Ms. Mesa asserts that Bureau of Labor Statistics ("BLS") employment data has "the

4    same authoritative standing as does the [DOT]."  (ECF No. 23 at 6.)  This is mistaken.  While the

5    SSA administrative notice regulation does list the BLS's Occupational Outlook Handbook, it does

6    not list the particular "BLS employment statistics and projections" cited by Ms. Mesa.  20 C.F.R.

7    § 404.1566(d); (ECF No. 23 at 6-7.).  From this mistaken premise, Ms. Mesa asserts that the

8    ALJ's reliance on the VE's testimony was an error because persuasive evidence is required to

9    justify reliance on a VE's testimony which contradicts a source of administrative notice.  (ECF

10   No. 21 at 16.)

11        As discussed above, the BLS data which Ms. Mesa cites is *not* a listed source of administrative

12   notice.  And the case Ms. Mesa cites in support of her argument, *Johnson v. Shalala*, 60 F.3d 1428

13   (9th Cir. 1995), does not address conflicts between VE's and administratively noticed sources

14   generally, but instead specifically relates to conflicts between a VE's testimony and the DOT.

15   Here, the VE's testimony was consistent with data contained in the DOT.  There was thus no

16   conflict requiring persuasive evidence to justify the ALJ's reliance on the VE's testimony.  That

17   reliance was thus appropriate.

**III.  REMAND FOR CONSIDERATION**

19        It is within the court's discretion to remand a case either for further administrative proceedings

20   or for an award of benefits.  *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Here,

21   the record is not developed fully, and the court thus remands to the ALJ.

**CONCLUSION**

23        For the foregoing reasons, Ms. Mesa's motion is **GRANTED IN PART** and **DENIED IN**

24   **PART**, the Commissioner's motion is **DENIED**, and the case is **REMANDED** for further

25   proceedings consistent with this order.

26        This disposes of ECF Nos. 21 and 22.

*United States District Court*
*Northern District of California*

1    **IT IS SO ORDERED**.

2    Dated: April 2, 2015

3

4    _____

5    LAUREL BEELER
     United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28